[No. B085253. Second Dist., Div. Three. Dec. 13, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
NITA ALMUETE PADDIT PALMA, Defendant and Appellant.

**COUNSEL**

Robert S. Gerstein for Defendant and Appellant

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Thomas Temmerman, Assistant Attorney General, and Malcolm Venolia, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—Defendant and appellant Nita Almuete Paddit Palma appeals from the judgment (order granting probation) entered following a jury trial in which she was convicted of six counts of receiving unlawful remuneration—Medi-Cal fraud, a violation of Welfare and Institutions Code section 14107.2, subdivision (a). This section prohibits the receipt of remuneration, including kickbacks, in return for the referral of any individual to a person for furnishing merchandise paid for by Medi-Cal, except payment by an employer to an employee. (Welf. & Inst. Code, § 14107.2, subds. (a), (c).)

Imposition of sentence was suspended and Palma was placed on probation for 3 years upon certain terms and conditions, providing she spend the first 180 days in county jail with 31 days of precommitment credit and ordered to pay a fine of $60,000.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The prosecution's case.*

In 1988, Ely Salanga owned a number of board-and-care homes with other members of his family.[1] In May of 1988, his niece, Maria Lourdes Arkoncel, began working at Belshire Glen Manor, one of the homes owned by Salanga and his wife. Arkoncel's brother worked at one of Salanga's other homes. Sometime in 1988, Salanga approached Arkoncel and her brother and told them he wanted to open a medical supply company but since he was the owner of a nursing home, he could not operate this kind of business. Therefore, Salanga wanted Arkoncel to be the president and her brother, the vice-president.

In 1989, Salanga started Primary Health Care Services (Primary Care) to supply incontinence products to nursing homes, with Arkoncel and her brother as officers of the corporation. However, they were merely figureheads and in fact, Arkoncel did nothing more than sign what others gave her.[2]

---

[1] Codefendant Ely Salanga was convicted of conspiracy to commit grand theft and submit false Medi-Cal claims in excess of $150,000, conspiracy to commit the crime of paying prohibited referral fees, grand theft of property valued in excess of $150,000, and four counts of paying unlawful remuneration. He is not a party to this appeal.

[2] Arkoncel later was arrested, and pursuant to a plea bargain, pleaded guilty to conspiracy to defraud the Medi-Cal program and conspiracy to pay illegal remuneration.

In 1989, Palma began working for Primary Care as a sales representative or agent. Her job was to submit Medi-Cal stickers and orders for incontinence supplies and deliver those supplies to the persons who ordered them.[3] According to Socorro Santos, who had been hired by Salanga to run Primary Care on a day-to-day basis, the sales representative was to submit a set of forms, including stickers, for each order.[4] At first, since Primary Care did not have supplies, the sales representatives were paid $150 for each sticker, out of which they would buy the supplies to fill the orders. Later, after Primary Care could fill the orders from its stock, the payment for each sticker was lowered to $100 for those who were not incontinent and to $120 for those who were.

Respecting Palma's employment status, Arkoncel testified Palma did not have set hours of employment but came into the office about three or four times a week. Each time, Palma would spend three or four hours sitting at a desk, soliciting business from the board-and-care homes. Palma had business cards and a pager from Primary Care.

Santos also testified that while Palma came into the office between two to four times a week and stayed a couple of hours, she did not work while she was there. Santos stated the solicitation of orders by the sales representative was an integral part of Primary Care's business because without the sales force, they had no way of soliciting business. When Palma was hired, she hardly had any experience and, as a sales representative, she received no training and needed no license for the job. Santos drafted a memorandum of instructions as to what information was needed by Medi-Cal to process the orders and tacked it on the bulletin board. According to Arkoncel, this memorandum was also mailed to the sales representatives. Most of the forms Arkoncel received from sales representatives were blank and she would decide how much to bill for supplies and fill in that amount on the form.

Aida Magdamo, who was associated with a number of board-and-care homes, was Palma's main source of Medi-Cal orders and stickers. Palma met Magdamo in a shopping mall, and Palma told her she was interested in getting into the medical supply business. They exchanged telephone numbers and later, they negotiated the price Palma would pay for each sticker she received. Magdamo told Palma she wanted $50 for each sticker. Palma

---

[3]Beneficiaries, when they enroll in Medi-Cal, get a card which identifies them and which they present to providers when they need medical services. Companies use the number on the card for billing. The card also has a number of stickers containing the beneficiaries' information, which providers can tear off and keep for their records to show they were providing services to someone who was in the program.

[4]Santos also pleaded guilty to receiving illegal remuneration. Nenita Jocson, one of the marketing representatives at Primary Care, pleaded guilty to paying kickbacks.

said $40 per sticker was her "top price," and Magdamo agreed to take $40. This arrangement continued from October 1989 through March 1990.

Primary care paid Palma $127,497 from October 1989 to March 1990 and $21,945 more in her husband's name. She was also paid $46,136 by Santos and an additional $16,138 in her husband's name, for a total of $211,716. Santos stated that when she paid sales representatives from her own account, she was reimbursed by Primary Care. Primary Care did not classify Palma as an employee and withheld no taxes from her pay. Santos admitted promising Palma health and dental benefits, but never provided them.

Other evidence was presented that the sales representatives were paid for bringing in orders, had no set hours, and no individual work spaces.

### 2. *The defense.*

Kenneth Mark Walheim, a certified public accountant, testified that after reviewing the relevant literature, exhibits and testimony, he believed Palma was an employee of Primary Care, not an independent contractor. Walheim described the right to control performance as the key factor in determining whether one is an employee or an independent contractor. He felt Primary Care had a right to control Palma's performance as evidenced by the fact she went to Primary Care's office two to four times a week to make and receive telephone calls. The calls, he was told, were monitored and commented on to ensure the sales representatives stayed within the scheme and "didn't go far afield." Also, the fact Palma had a pager and was using forms supplied by Primary Care supported the conclusion she was an employee.

### 3. *Finding.*

Palma was convicted for receiving unlawful remuneration as an independent contractor pursuant to Welfare and Institutions Code section 14107.2 subdivision (a).

### CONTENTIONS

Palma contends (1) the statutory exemption for employees should be construed in everyday terms which further the purpose of the statute, and she was, as a matter of law, an employee in the "everyday" meaning of the term; (2) even construing the concept of employment in technical terms, as the trial court did, there is no substantial evidence to support a finding she was not an employee beyond a reasonable doubt; and (3) the trial court committed prejudicial error in denying her request for a pinpoint instruction relating the reasonable doubt standard to the employment issue.

### DISCUSSION

1. *Independent contractors are not employees under Welfare and Institutions Code section 14107.2.*

Welfare and Institutions Code section 14107.2, subdivision (a), largely adopts the language of the federal statute[5] on which it is based and states: "Any person who solicits or receives any remuneration, including, but not restricted to, any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in valuable consideration of any kind either: [¶] (1) In return for the referral, or promised referral, of any individual to a person for the furnishing or arranging for the furnishing of any service or merchandise for which payment may be made in whole or in part [by Medi-Cal]" is guilty of a felony-misdemeanor.

Subdivision (b) thereof uses the same language with respect to paying illegal remuneration. Subdivision (c) exempts from those offenses, "[a]ny amount paid by an employer to an employee, who has a bona fide employment relationship with that employer, for employment with provision of covered items or services." (Welf. & Inst. Code, § 14107.2, subd. (c)(1).)

■ Palma contends the "common-sense understanding of employment" should be adopted, not the "technical distinction between employees and independent contractors," and the phrase "bona fide employment relationship" in Welfare and Institutions Code section 14107.2, subdivision (c), should be interpreted to mean one in which a person works "for another in return for financial or other compensation." She argues that anybody who "works for" the person paying for Medi-Cal orders would not be receiving illegal remuneration while "an outsider who refers business to that firm" would be.

### *"Employee" properly defined pursuant to common law.*

Under section 14107.2 of the Welfare and Institutions Code, the employee exception applies only to payments from "an employer to an employee." The term "employee" is not defined by either the California or federal statute. However, as a general rule, when "employee" is used in a statute without a definition, the Legislature intended to adopt the common law definition and

---

[5]See 42 United States Code section 1320a-7b(b), which provides in part: "(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— [¶] (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part . . . shall be guilty of a felony . . . ."

to exclude independent contractors. (See *Isenberg* v. *California Emp. Stab. Com.* (1947) 30 Cal.2d 34, 38-39 [180 P.2d 11]; *Figone* v. *Repetti* (1909) 11 Cal.App. 251, 252 [104 P. 583]; see also *Community for Creative Non-Violence* v. *Reid* (1989) 490 U.S. 730, 740-741 [104 L.Ed.2d 811, 824-825, 109 S.Ct. 2166]; *Brown* v. *Luster* (9th Cir. 1947) 165 F.2d 181, 184.)

As Palma acknowledges, the stated purpose of both the federal and state statutes is to deter laboratories and medical supply firms from giving "any kickback, bribe or rebate" to doctors, hospitals or board-and-care homes in order to secure business from them involving patients covered by Medi-Cal. However, contrary to Palma's argument that sufficient protection for the government health programs would be accomplished by adopting a discretionary definition of employment, the statute's purpose would be undermined by protecting payments to independent contractors and would increase the possibility false claims would be submitted to Medi-Cal since the chances of uncovering any kickback schemes would be greatly decreased.

■ In an employment relationship, the employer is generally fully liable for the employee's actions and therefore is motivated to supervise and *control* the employee. The independent contractor relationship, on the other hand, is not subject to such control and cannot be regulated. (See *Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 950 [88 Cal.Rptr. 175, 471 P.2d 975].) ■ Further, the California Legislature, when it enacted Welfare and Institutions Code section 14107.2, was adopting the federal statutes. Under the federal regulation, the common law rules are used in determining what constitutes an employer/employee relationship. In fact, the regulation states "*employee* has the same meaning as it does for purposes of 26 U.S.C. § 3121 (d)(2)." (See 42 C.F.R. § 1001.952(i) (1994).) That tax code section defines an employee as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee. . . ." (26 U.S.C. § 3121(d)(2).)

Clearly, counsel and the trial court correctly interpreted the concept of "bona fide employment" as embodying the legal distinction between an employee and an independent contractor, and the jury was properly instructed. There was no error.

2. *Substantial evidence supports Palma's convictions for receiving unlawful remuneration as an independent contractor.*

■ Palma's contention there was insufficient evidence to support a finding she was not an employee beyond a reasonable doubt is without merit. A finding as to whether a person is an employee or an independent contractor is generally treated as a question of fact (see *Anaheim General Hospital* v.

*Workmen's Comp. App. Bd.* (1970) 3 Cal.App.3d 468, 472 [83 Cal.Rptr. 495]), and Palma's contention amounts to no more than a request to this court to reweigh the evidence and to substitute its judgment for that of the trier of fact. That is not the function of an appellate court. (*People* v. *Von Villas* (1992) 11 Cal.App.4th 175, 247 [15 Cal.Rptr.2d 112]; *People* v. *Barnes* (1986) 42 Cal.3d 284, 304 [228 Cal.Rptr. 228, 721 P.2d 110].)

Here, the jury was instructed as to how to evaluate the facts in the eyes of the law, and was told the most important factor to consider in determining whether a worker is an employee or an independent contractor is whether the person to whom service is rendered *controls* the manner and means of accomplishing the desired result.[6] (See *S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 [256 Cal.Rptr. 543, 769 P.2d 399].) From the record, Palma herself negotiated the price she would pay for the Medi-Cal stickers; she had no individual workspace; she had no regular or even minimum hours of employment; no training for her job was provided by Primary Care; she was paid on a commission basis; she had no regular salary and no taxes were withheld, and she received no health or dental benefits.

Contrary to Palma's argument, from the evidence presented, together with the reasonable inferences therefrom, there was sufficient evidence presented both in the case-in-chief as against a Penal Code section 1118.1 motion for

---

[6]More specifically, the jury was given the following special instruction (employee or independent contractor—distinction) in part: "While both an employee and an independent contractor work for another person, there is an important distinction between them. [¶] One is the employee of another person, called the employer, if she is authorized to act for or in place of the employer and is subject to the right of the employer to control her actions. [¶] An independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents her employer only as to the results of her work, and not as to the means whereby it is to be accomplished. [¶] The most important factor in determining whether one is an employee or independent contractor is whether the employer has the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, [an] employer-employee relationship exists. [¶] Strong evidence in support of an employer-employee relationship is the right to discharge at will, without cause. [¶] Other factors to be taken into consideration in determining whether a person is an employee or independent contractor are: [¶] (a) Whether or not the one performing services is engaged in a distinct occupation or business; [¶] (b) Whether, in the locality, the kind of occupation or business is one in which the work is usually done under the direction of [an] employer or by a specialist without supervision; [¶] (c) The skill required in the particular occupation or business; [¶] (d) Whether the employer or the worker supplies the instrumentalities, tools and the place of work for the person doing the work; [¶] (e) The length of time for which the services are to be performed; [¶] (f) The method of payment, whether based on time or by the job; [¶] (g) Whether or not the work is part of the regular business of the alleged employer; and [¶] (h) Whether or not the parties believe they are creating [an] employer-employee relationship or independent contractor."

acquittal, and for the jury to conclude she was an independent contractor and not an employee of Primary Care. Therefore, Palma properly was convicted of receiving unlawful remuneration.[7]

3.  *Because the trial court instructed the jury on the issue of Palma's employment status, a pinpoint instruction was not necessary.*

■ Palma's contention the trial court erred in refusing her request for a pinpoint instruction on the issue of employment is without merit. Specifically, Palma requested the following instruction be given: "If, after consideration of all the evidence, you have a reasonable doubt that defendant Palma was not an employee of Primary Care Health Services at the time she received any remuneration from Primary Care Health Services, you must find her not guilty."

Before jury selection commenced, the trial court denied Palma's motion *in limine* for an order placing the burden of proving a bona fide employment relationship did not exist on the prosecution, and ruled the issue of employee status was an affirmative defense. The trial court, however, later reversed its ruling and required the prosecution to prove as an element of the offense of receiving illegal remuneration that Palma was not an employee. In accordance therewith, the trial court instructed the jury as to the prosecution's burden.

The jury was instructed, "Defendant Palma is charged in counts 10, 11, 12, 13, 14 and 15 of the information with having committed the crime of receiving unlawful remuneration, in violation of Welfare and Institutions Code section 14107.2, subdivision (a). [¶] In order to prove such crime, each of the following elements must be proved: [¶] 1. Defendant Palma solicited or received remuneration from another; [¶] 2. the remuneration was either: [¶] a. for referring Medi-Cal beneficiaries to another so that that person could furnish services or merchandise for which payment could be made by the Medi-Cal program; or [¶] b. for arranging for the ordering of services or merchandise for which payment could be made by the Medi-Cal program; and [¶] 3. *defendant Palma was not an employee.*" (Italics added.)

In addition, as stated *ante*, footnote 6, the jury also was instructed as to the distinction between an employee and independent contractor.

Further, the trial court gave the standard reasonable doubt instruction (CALJIC No. 2.90). The fact the prosecution was required to prove every

[7]Palma's assertion the trial court erred in denying her Penal Code section 1118.1 motion for acquittal is equally without merit. The trial court had before it more than enough evidence to justify denial of the motion. (Cf. *People* v. *Mixon* (1982) 129 Cal.App.3d 118, 135-136 [180 Cal.Rptr. 772]; see *People* v. *Sauceda* (1962) 199 Cal.App.2d 47, 55 [18 Cal.Rptr. 452].)

essential element of the charge against Palma beyond a reasonable doubt was emphasized by CALJIC No. 2.61.[8] Thus, from the record, the substance of Palma's requested instruction was adequately set forth in the instructions given, and the refusal to give the requested instruction was not error. (See *People* v. *Mincey* (1992) 2 Cal.4th 408, 437 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Farmer* (1989) 47 Cal.3d 888, 913-914 [254 Cal.Rptr. 508, 765 P.2d 940].)

Moreover, it should be noted the issue of employee status should have been treated as an affirmative defense, and the trial court ruling to the contrary was error. The burden of proving Palma was not an employee should not have been shifted to the prosecution. ■ "It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant. [Citations.] . . . [W]here exceptions or provisos are not descriptive of the offense, or define it, but rather afford a matter of excuse, 'they are to be relied on in [the] defense.' " (*In re Andre R.* (1984) 158 Cal.App.3d 336, 341-342 [204 Cal.Rptr. 723]; see also *People* v. *George* (1994) 30 Cal.App.4th 262, 275 [35 Cal.Rptr.2d 750].) ■ This error, however, was not prejudicial to Palma, since the prosecution's burden of proving her guilty of the charged offense was unnecessarily increased.

Contrary to Palma's arguments, there is nothing in the record to indicate the jury was confused by the special instruction requiring the prosecution to prove a negative, i.e., she was "not an employee," and it must be presumed the jury both understood and followed the trial court's instructions. (See *People* v. *Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].) Moreover, the requested pinpoint instruction also used the phrase "not an employee" and would not have dispelled any confusion, if there had been any.

CONCLUSION

The term "employee" in Welfare and Institutions Code section 14107.2, subdivision (c), was properly defined pursuant to common law to exclude independent contractors and the jury properly was instructed in this regard. The trial court did not err in refusing Palma's request for a pinpoint instruction on the issue of employment. The trial court properly denied

---

[8]CALJIC No. 2.61 (1990 rev.) (5th ed. pocket pt.) states: "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against [her]. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against [her] on any such essential element."

Palma's Penal Code section 1118.1 motion for acquittal. There was substantial evidence to support the finding she was not an employee and therefore was guilty of six counts of receiving unlawful remuneration—Medi-Cal fraud.

## DISPOSITION

The judgment (order granting probation) is affirmed.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied January 10, 1996, and appellant's petition for review by the Supreme Court was denied March 13, 1994.